John M. WISEMAN, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. No. 8–198.

United States District Court
D. Maine, S. D.

Aug. 4, 1966.

Charles H. Abbott, Lewiston, Me., David M. Scheffer, Jerome Gotkin, Benjamin Arac, Boston, Mass., for plaintiff.

Lloyd P. LaFountain, U. S. Atty., Portland, Me., Rufus E. Stetson, Jr., Tax Div., Dept. of Justice, Jack S. Levin, Office of Sol. Gen., Dept. of Justice, Washington, D. C., for defendant.

## OPINION AND ORDER OF THE COURT

GIGNOUX, District Judge.

This is an action for refund of $92,-302.50 federal incomes taxes for the year 1961, plus assessed interest in the amount of $16,532.25, paid by plaintiff under a deficiency assessment of the Commissioner of Internal Revenue.[1] The case presents the question of whether the transfer of plaintiff's stock in one of two brother-sister corporations owned by him, in exchange for the creation of an indebtedness to plaintiff on the books of the other corporation, gave rise to a corporate distribution "essentially equiv-

alent to a dividend" within the meaning of Sections 302(b) (1), 304(a) (1), and related sections of the Internal Revenue Code of 1954, 26 U.S.C. §§ 302(b) (1), 304(a) (1).

The facts are essentially undisputed.

The taxpayer, John M. Wiseman, was, during the period in question, on the cash receipts and disbursements method of accounting. In March, 1961 he owned all the stock of Industrial Realty Co., Inc., a Maine corporation, and Southern Comfort Realty Company, a Florida corporation. Industrial's assets consisted of investment securities and real property in Maine and elsewhere. It was realizing substantial profits. Southern's sole business activity was the ownership of rental properties in Florida. For several years it had been regularly incurring losses in its operations. In order to "stop the loss," plaintiff was anxious to liquidate Southern. To accomplish this, plaintiff's accountant, Chester M. Foss, on March 22, 1961, recommended the following plan:

(1) Southern would issue 1,157 shares of its $100 par value common stock to plaintiff in satisfaction of an indebtedness owed plaintiff by Southern in the amount of $115,700. After the completion of this transaction, plaintiff would own 1,257 shares, being all Southern's outstanding capital stock. (2) Plaintiff would "sell" his 1,257 shares of Southern stock to Industrial in exchange for a "note" from Industrial for $125,700, "with interest." (3) Industrial would subsequently liquidate Southern by acquiring all its assets and retiring its stock.

The stated purpose of this plan was to enable the two corporations to file a consolidated income tax return, Mr. Foss mistakenly believing that thereby Southern's losses could be offset against Industrial's profits and that Industrial would be entitled to a tax loss upon the subsequent liquidation of Southern.

Pursuant to Mr. Foss' recommendation, on March 23, 1961, Southern's Board of

**l.** The jurisdiction of this Court is based upon 28 U.S.C. § 1346(a) (1).

Directors authorized the issuance of 1,157 shares of Southern stock to plaintiff in payment of its $115,700 indebtedness to him, and on March 25, 1961, Industrial's Board of Directors voted to "buy" the 1,257 shares of Southern stock then owned by plaintiff for its book value as of March 31, 1961. Thereafter, on March 31, 1961, plaintiff transferred all his Southern stock to Industrial.[2] This transaction was reflected on the books of Industrial by the following journal entry, as of March 31, 1961:

|  | Debit | Credit |
|---|---|---|
| Investment in Southern Comfort Realty | $125,700 | |
| Notes Payable—J. M. Wiseman | | $125,700 |
| To purchase 1257 shares of Southern Comfort Realty Co. Capital Stock | | |

The transaction was recorded in Industrial's ledger by a credit of $125,700 to an account entitled "Notes Payable—John M. Wiseman" and by a debit of $125,700 to an account entitled "Investment in Southern Comfort Realty Company 1257 shares (100%)." So far as the present record discloses, however, no note for $125,700 was ever issued by Industrial to plaintiff in connection with this transaction.

As of March 31, 1961, Industrial was indebted to plaintiff in the total amount of $254,756.77. Of this indebtedness, $35,424.38 was then due; $151,389.88 was due in 1964; and the record does not show the due date of the remaining $67,942.51. Between March 31 and December 31, 1961, Industrial paid plaintiff approximately $33,000 on account of its indebtedness to him. During the same period, plaintiff also loaned to Industrial substantial additional sums, so that as of December 31, 1961, Industrial owed plaintiff a total of $536,689.24, including the $125,700 debt for the Southern stock. As of March 31, 1961, Industrial's total cash on hand amounted to $9,806.36; as of December 31, 1961, Industrial had $170,757.65 cash on hand. During the first three months of 1962 Industrial made additional payments to plaintiff of $139,018.67 on account of its indebtedness to him.

On November 30, 1961, the books of Industrial show a bookkeeping entry transferring $184,549.64 of its indebtedness to plaintiff, including the $125,700 owed in connection with the Southern transaction, to an "Accommodation Account." The journal entry transferring this indebtedness appears on the books of Industrial as follows:

|  | Debit | Credit |
|---|---|---|
| Notes Payable – JMW 2/6/57 | $ 20,000.00 | |
| Notes Payable – JMW 10/22/57 | 10,000.00 | |
| Notes Payable – JMW 10/22/57 | 15,000.00 | |
| Notes Payable – JMW 2/4/60 | 13,849.64 | |
| Notes Payable – JMW | 125,700.00 | |
| Accommodation – JMW | | $184,549.64 |
| To consolidate notes payable to JMW | | |

---

2. It appears that it was not until May 1962 that Southern took the steps required by Florida corporation law to authorize the creation of the additional Southern stock issued to plaintiff. Plaintiff, however, does not press his original contention that any irregularities in the issuance of this stock could affect the tax consequences of the transaction.

On May 10, 1962, pursuant to a recommendation of Mr. Foss, Industrial's stockholders adopted the necessary corporate resolutions for the issuance to plaintiff of an additional 2,000 shares of Industrial's common stock in cancellation of $200,000 of its indebtedness to him. This transaction was reflected in Industrial's journal by the following entry dated June 30, 1962:

|  | Debit | Credit |
|---|---|---|
| Due to John M. Wiseman | $200,000 | |
| Capital Stock | | $200,000 |

To record issuance of 2,000 shares of capital stock 5/10/62 in exchange for debt

---

Industrial's ledger shows that as of the same date the Accommodation Account was debited by $200,000.

In his audit of plaintiff's 1961 income tax return, the Commissioner of Internal Revenue took the position that the creation of the $125,700 indebtedness from Industrial to plaintiff on March 31, 1961, constituted a distribution essentially equivalent to a dividend, and consequently was taxable as ordinary income to plaintiff to the extent that Industrial had accumulated earnings and profits as of December 31, 1961.[3] Plaintiff paid under protest the resulting deficiency assessment, and after his claim for refund was disallowed, brought this action.

For the reasons stated below, this Court concurs with the Commissioner, and sustains the deficiency assessment.

Section 304(a) (1) of the 1954 Code provides that if the same persons are in control of two corporations, and one of the corporations acquires stock in the other corporation from the persons in control, then the transaction "shall be treated as a distribution in redemption of the stock of the corporation acquiring such stock."[4] Section 304 was enacted in the 1954 Code to prevent controlling stockholders from withdrawing earnings and profits from one of two controlled corporations at capital gains rates through the simple device of selling the stock of one corporation to the other corporation.[5] The effect of the enactment of Section 304 was to bring such transactions involving related corporations within the scope of Section 302 of the 1954 Code. See S.Rep. No. 1622, 83d Cong., 2d Sess. pp. 239–40 (3 U.S.

3. It is undisputed that Industrial had $120,020.81 accumulated earnings and profits as of December 31, 1961.

4. SEC. 304. REDEMPTION THROUGH USE OF RELATED CORPORATIONS.
   (a) *Treatment of Certain Stock Purchases.*—
   (1) *Acquisition by related corporation* (other than subsidiary).—For purposes of sections 302 and 303, if—
   (A) one or more persons are in control of each of two corporations, and
   (B) in return for property, one of the corporations acquires stock in the other corporation from the person (or persons) so in control, then (unless paragraph (2) applies) such property shall be treated as a distribution in redemption of the stock of the corporation acquiring such stock. In any such case, the stock so acquired shall be treated as having been transferred by the person from whom acquired, and as having been received by the corporation acquiring it, as a contribution to the capital of such corporation.

5. Section 304 was enacted to foreclose the result reached in Commissioner of Internal Revenue v. Pope, 239 F.2d 881 (1st Cir. 1957), in which it was held that the sale of stock in one corporation to another corporation by a taxpayer who owned a substantial majority interest in both corporations did not result in a dividend distribution.

Cong. and Adm.News 4621, 4876–4877 (1954)). Section 302 provides in relevant part that if a corporation redeems its own stock, the redemption shall be treated as an exchange (and taxed at capital gains rates) if the redemption is not essentially equivalent to a dividend. If, however, the redemption is essentially equivalent to a dividend, then it is taxable at ordinary income rates under Sections 301, 316 and 317 of the Code, 26 U.S.C. §§ 301, 316 and 317.[6] See generally, United States v. Collins, 300 F.2d 821, 822–823 (1st Cir. 1962); Kerr v. Commissioner, 326 F.2d 225, 228–229 (9th Cir.1964).

■ From the outset, plaintiff has conceded that Industrial and Southern were brother-sister corporations within the meaning of the Code, and that therefore the acquisition by Industrial of his Southern stock came within the ambit of Section 304. Plaintiff vigorously contends, however, that he did not receive any distribution from Industrial in 1961 within the meaning of Section 302 of the Code. The main thrust of his argument is that nothing was "extracted or flowed from" Industrial to plaintiff in 1961 as a result of the Southern stock transaction. His position is that there can be no distribution within the meaning of Section 302 unless there is an actual segregation and transfer of corporate assets to the stockholder, and that the mere creation of a book indebtedness from Industrial to plaintiff, which was not in fact paid in 1961, did not result in the segregation or transfer to plaintiff of any part of Industrial's assets in that year.[7] But it has been

---

6. SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(a) *General Rule.*—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

(b) *Redemptions treated as exchanges.*—

(1) *Redemptions not equivalent to dividends.*—

Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

\* \* \* \* \*

(d) *Redemptions treated as distributions of property.*—

Except as otherwise provided in this subchapter, if a corporation redeems its stock (within the meaning of section 317(b)), and if subsection (a) of this section does not apply, such redemption shall be treated as a distribution of property to which section 301 applies. Sections 301(a) and (c) (1) provide that in case of a distribution of property (as defined in Section 317(a)) made by a corporation to a shareholder with respect to its stock, that portion of the distribution which is a dividend (as defined in Section 316) shall be taxable as ordinary income.

Section 316(a) defines a dividend as "any distribution of property made by a corporation to its shareholders \* \* \* out of its earnings and profits."

Section 317(a) defines property as "money, securities, and any other property; except that such term does not include stock in the corporation making the distribution \* \* \*," and Section 317(b) provides that stock shall be treated as redeemed by a corporation "if the corporation acquires its stock from a shareholder in exchange for property. \* \* \* "

In general, Section 305 of the 1954 Code, 26 U.S.C. § 305, makes distributions of common stock non-taxable, and Section 306, 26 U.S.C. § 306, makes distributions of preferred stock taxable only when redeemed or transferred by the stockholder.

7. The record wholly fails to support plaintiff's suggestion that no indebtedness was created as a result of the Southern stock transaction. His argument is that it was contemplated from the outset that he was to receive Industrial stock in exchange for his Southern stock, and that in fact stock was all he did receive fourteen months later in May 1962. But as recited above, every contemporaneous record speaks in terms of a "sale" of plaintiff's Southern stock to Industrial in exchange for a "note" from Industrial. While so far as the record discloses, plaintiff did not actually receive a note, there can be little question that the corporate records and book entries accurately reflected the nature of the transaction which plaintiff had been advised to carry out, and that from the inception of

authoritatively determined that a distribution within the meaning of Section 302 occurs whether the redeeming corporation makes an immediate cash payment to the stockholder, United States v. Collins, supra; Hasbrook v. United States, 343 F.2d 811 (2d Cir.), cert. denied, 382 U.S. 834, 86 S.Ct. 77, 15 L. Ed.2d 77 (1965); issues a written corporate obligation to the stockholder, Bazley v. Commissioner of Internal Revenue, 331 U.S. 737, 67 S.Ct. 1489, 91 L.Ed. 1782 (1947) (debenture bonds); Kerr v. Commissioner of Internal Revenue, supra (promissory note); cancels a pre-existing debt of the stockholder to the corporation, Bradbury v. Commissioner of Internal Revenue, 298 F.2d 111 (1st Cir.1962); or creates a new debt of the corporation to the stockholder. Ibid.

Thus, in Bazley v. Commissioner of Internal Revenue, supra, where, pursuant to a plan of reorganization of a family corporation, the stockholders received debenture bonds, the Supreme Court held that the full value of the debentures was properly taxable as dividend income to the stockholders. The Court stated:

> "In the case of a corporation which has undistributed earnings, *the creation of new corporate obligations* which are transferred to stockholders in relation to their former holdings, so as to produce, for all practical purposes, the same result as a distribution of cash earnings of equivalent value, cannot obtain tax immunity * * *
>
> * * * * * *
>
> "The debentures * * * were virtually cash because they were callable at the will of the corporation which in this case was the will of the taxpayer." 331 U.S. at 742, 67 S.Ct. at 1491 (Emphasis supplied.)

In the present case, as in *Bazley,* the Southern transaction created a "new corporate obligation" from Industrial to plaintiff, which was payable "at the will of the corporation which in this case was the will of the taxpayer." Although in *Bazley* the corporation issued debenture bonds to evidence its indebtedness to its stockholders, it is significant that the Supreme Court did not limit its holding to the creation of a debt evidenced by a writing, but spoke in terms of "the creation of new corporate obligations" to the stockholders.

So also, in Kerr v. Commissioner of Internal Revenue, supra, where the taxpayer transferred the stock of one of two controlled corporations to the other corporation in exchange for a $50,000 note of the transferee corporation, the court held that the stockholder was subject to a dividend tax upon the face value of the note. The court specifically observed that no distinction was to be made because a note rather than cash was involved. 326 F.2d at 235, n. 9. Similarly, there is no logical basis for drawing a distinction between *Kerr* and the present case because in this case the corporation's indebtedness to plaintiff was not represented by a note. Plaintiff at all times had it wholly within his power to cause Industrial to issue a note to evidence this obligation.[8]

Finally, in Bradbury v. Commissioner of Internal Revenue, supra, the Court of Appeals for this Circuit considered the precise question which the case at bar presents to this Court. In that case the principal stockholder of a Maine corporation was indebted to the corporation in the amount of $21,069. When the corporation sought to finance new construction through its bank, the bank requested that the stockholder's indebted-

---

the transaction the creation of a debtor-creditor relationship between plaintiff and Industrial was contemplated. Indeed, the first suggestion that Industrial might issue additional stock to plaintiff in satisfaction of part of its indebtedness to him was not made until April 1962, more than a year after the Southern transaction, and even then there was no indication that

the stock was to be issued in exchange for the Southern stock acquired the previous year.

8. As has been noted, it was contemplated from the inception of the Southern transaction that plaintiff would receive a note of Industrial in exchange for his Southern stock. See n. 7, supra.

ness to the corporation first be "cleaned up some way." In order to accomplish this, the stockholder transferred forty-four shares of her stock to the corporation, which credited her account with $22,489. The effect of this transaction was to cancel her indebtedness to the corporation and to leave a balance of $1,420 owed by the corporation to her, which was recorded on the corporate books as an open account payable. The Commissioner took the position that the stockholder received a taxable dividend in the full amount of the $22,489 credited to her account, and both the Tax Court and the Court of Appeals agreed. As stated by the Court of Appeals, the case raised

> " * * * the question of whether the cancellation of petitioner's indebtedness to a corporation *and an additional credit to her account*, upon the redemption of forty-four shares of stock which she held in the corporation were a distribution essentially equivalent to a dividend within the meaning of Section 302(b) (1) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 302 (b) (1)." 298 F.2d at 112. (Emphasis supplied.)

This question the court answered in the affirmative, holding that the "redemption of petitioner's stock was essentially equivalent to a dividend and taxable as such." Id. at 119.[9]

▮ Despite the import of *Bradbury*, plaintiff argues that he received no dis-

tribution in 1961, because the corporation transferred to him "no cash or cash equivalent" in that year. See Wolf Envelope Co. v. Commissioner, 17 T.C. 471 (1951); 2 Mertens, Law of Federal Income Taxation, § 11.01 (1942). However, even if *Bradbury* were not controlling authority for the proposition that the creation of a debt, although not evidenced by a written obligation, constitutes a distribution within the meaning of Section 302(b) (1), it has long been recognized by the Court of Appeals for this Circuit, and elsewhere, that when a corporation incurs a debt to its controlling stockholder, and during the taxable year the corporation has the financial capacity to pay the debt, and the stockholder has it within his power to cause the debt to be paid, the stockholder, even though on the cash basis, has taxable income to the extent of the corporate indebtedness to him. See, e. g., Ross v. Commissioner of Internal Revenue, 169 F.2d 483, 490–492 (1st Cir.1948) (Frankfurter, Circuit Justice); Benes v. Commissioner of Internal Revenue, 42 T.C. 358, 380–82 (1964), aff'd mem., 355 F.2d 929 (6th Cir.1966); A. D. Saenger, Inc. v. Commissioner of Internal Revenue, 84 F.2d 23, 24–25 (5th Cir.1936); Baker v. United States, 17 F.Supp. 976, 979–980, 84 Ct.Cl. 428 (1937); 2 Mertens, op. cit. supra, § 10.03 (1942). This so-called constructive receipt doctrine has been incorporated in the income tax regulations since 1918.[10] In Ross v. Com-

---

9. Plaintiff suggests that in Bradbury the Court of Appeals "overlooked" the fact that a portion of the amount credited to the stockholder's account upon the redemption of her stock was in excess of the amount necessary to cancel her pre-existing indebtedness, and created a new debt of the corporation to her. However, United States v. Collins, supra, which was decided less than three months after Bradbury, makes it clear that the Court of Appeals did not miss this point in Bradbury. In Collins, the same court once again stated that in Bradbury

"[t]he question was whether the cancellation of taxpayer's indebtedness to her own corporation *and an additional credit to her account*, upon the redemp-

tion of shares of stock which she held in that corporation was a distribution essentially equivalent to a dividend within the meaning of Section 302." 300 F.2d at 826 (Emphasis supplied.)

10. See Treas.Reg. § 1.451–2(a), which currently provides:

"Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is *credited to his account*, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given." (Emphasis supplied.)

missioner of Internal Revenue, supra, the Court of Appeals recognized that the doctrine has become "a rule of law, determining what constitutes taxable income." 169 F.2d at 492.[11] Its purpose is to prevent a cash basis taxpayer "from choosing the year in which to return income merely by choosing the year in which to reduce it to possession." Id. at 491. As the Supreme Court stated with respect to a similar principle in Corliss v. Bowers, 281 U.S. 376, 50 S.Ct. 336, 74 L.Ed. 916 (1930),

> "The income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not." 281 U.S. at 378, 50 S.Ct. at 337.

■■ In the present case, the record is clear that Industrial had the financial ability to pay to plaintiff during 1961 the $125,700 it owed him as a result of the Southern transaction, and plaintiff plainly had it within his power to cause Industrial to do so. On December 31, 1961, Industrial had a cash balance of $170,757. Although plaintiff argues that Industrial's cash balance at the end of 1961 must be allocated to the payment of its debts to plaintiff in the order in which they came due, only $35,424 of the indebtedness, other than the Southern debt, which Industrial owed plaintiff at the end of 1961 had matured as of March 31, 1961, the effective date of the Southern transaction.[12] Industrial's cash balance of $170,757 at the end of 1961 was more than sufficient to pay in full this indebtedness, together with the $125,700 Southern debt.[13] While plaintiff contends further that Industrial's business needs might have required it to retain the entire $170,757 in cash, he made no effort to sustain his burden of proof in this respect, see n. 12, supra, and in fact the record conclusively demonstrates the contrary. It shows that Industrial's current income was more than sufficient to meet its regular operating expenses. It also shows that Industrial did not need this cash for investment purposes, because during the first three months of 1962 it actually did pay out $139,018 in cash to plaintiff on account of its indebtedness to him. Moreover, even if Industrial's cash balance at the end of 1961 had not been sufficient to permit it to pay its $125,700 debt to plaintiff, the courts have consistently applied the constructive receipt doctrine, even when a corporation did not have sufficient cash on hand to pay a debt to its controlling stockholder, if the corporation was generally solvent and reasonably prosperous, so that it could have raised the money either by borrowing or by selling assets. See, e. g., Roe v. Commissioner of Internal Revenue, 192 F.2d 398, 402–403 (5th Cir. 1951); A. D. Saenger, Inc. v. Commissioner of Internal Revenue, supra, 84 F.2d at 25; Baker v. United States, supra, 17 F.Supp. at 979–980; Jacobus v. United States, 9 F.Supp. 41, 45, 80 Ct.Cl. 357 (1934). There is no question on this record that Industrial's over-all financial condition throughout 1961 was such that it could have raised the money to pay its $125,700 debt to plaintiff upon his demand. The only thing which pre-

---

11. And see Baker v. United States, supra, in which the court stated that the constructive receipt regulations "have been included in all Treasury regulations since 1918 and have been accepted and approved by Congress through subsequent re-enactment of the statute." 17 F.Supp. at 979.

12. As has been set forth above, Industrial owed plaintiff $254,756 as of March 31, 1961, but $151,390 of this indebtedness was not due until 1964, and the record does not show the due date of the remaining $67,942. Since the taxpayer has the burden of proof in a tax refund suit,

United States v. Anderson, 269 U.S. 422, 443, 46 S.Ct. 131, 70 L.Ed. 347 (1926); Brooks v. Commissioner of Internal Revenue, 35 F.2d 178, 179 (4th Cir. 1929); Union Co. v. United States, 46 F.2d 717, 719, 71 Ct.Cl. 485 (1929), the Court must conclude on this record that there was due and owing to plaintiff only $35,424 when the Southern debt was incurred.

13. The $33,000 Industrial paid plaintiff between March 31 and December 31, 1961, on account of its indebtedness to him must also be allocated to the discharge of this prior debt.

vented the payment of this debt in 1961 was "the volition of the taxpayer." Ross v. Commissioner of Internal Revenue, supra, 169 F.2d at 491. Under the authorities which have been cited, plaintiff was therefore subject to tax as if the debt had been paid.[14]

Plaintiff next contends that even if he received a distribution from Industrial in 1961 in connection with the Southern stock transaction, the distribution was not essentially equivalent to a dividend. This contention must also be rejected. The Court of Appeals for this Circuit has recently and fully discussed the question of dividend equivalence in Bradbury v. Commissioner of Internal Revenue, supra, and United States v. Collins, supra. In each of these cases the court held, in circumstances closely comparable to those in this case, that the distribution to the controlling stockholder involved was essentially equivalent to a dividend. In so doing, the court stated the controlling criteria in the following language:

> " '[W]e believe that the indispensable first step in making this determination [of dividend equivalency] is whether the redemption of stock has caused a meaningful change in the position of the shareholder with relation to his corporation and the other shareholders.
>
> \* \* \* \* \* \*
>
> " 'The determination that a distribution in redemption has worked an essentially *pro rata* distribution and produced no material or significant shift in the corporate-shareholder relationship does not, of course, terminate inquiry into whether the transaction which produced these results was or was not essentially equivalent to a dividend. We simply say that in the

hierarchy of criteria which may be adduced as evidentiary of this ultimate conclusion these factors must be accorded a preeminent position. And, where they are present, the record must contain conspicuously countervailing considerations to dispel the aura of dividend equivalence which their presence irresistibly impels.' " United States v. Collins, supra, 300 F.2d at 826 (Quoting Bradbury v. Commissioner of Internal Revenue, supra, 298 F.2d at 116, 117.)

In the present case, as in *Bradbury* and *Collins*, there can be no question that the result of the Southern transaction was to effectuate no basic change in plaintiff's ownership or control of Industrial and Southern. Both before and after the transaction plaintiff owned all the stock of Industrial, and the only effect of the transfer of his Southern stock was that after it was completed, plaintiff owned all the stock of Southern indirectly through his ownership of Industrial. He still retained 100% of the ownership and control of both corporations.

Plaintiff urges that the distribution should not be treated as a dividend because the transaction as a whole had a proper business purpose. But in *Bradbury*, the Court of Appeals held that " 'the mere existence of a single bona fide corporate purpose will not, standing alone, conclusively determine that the transaction does not result in an essential equivalent of the distribution of a taxable dividend.' " 298 F.2d at 118 (quoting United States v. Fewell, 255 F.2d 496, 500 (5th Cir.1958)). In *Bradbury*, the court also stated, in language which is pertinent here:

> " \* \* \* for business purpose to be of really meaningful import the di-

---

14. The case of Hyland v. Commissioner of Internal Revenue, 175 F.2d 422 (2d Cir. 1949), upon which plaintiff relies, is plainly distinguishable. In Hyland, unlike the instant case, the court, upon the basis of the record before it, expressly found that no enforceable debt had been created from the corporation to the taxpayer, the payment of which was unqualifiedly subject to his demand. The court

also pointed out that there was no evidence the taxpayer even knew of the directors' resolution authorizing his compensation before he received it. R. E. Hughes, Jr. v. Commissioner of Internal Revenue, 42 T.C. 1005 (1964) and Appeal of Ter Bush, 4 B.T.A. 984 (1926), also cited by plaintiff, are similarly distinguishable.

chotomy between shareholder and corporation must be more sharply drawn than is the case here. In a case such as the instant one, while, on the verbal level, there may be a conceptually distinct corporate and shareholder purpose, as a matter of economic import, it is unrealistic to attempt to segregate them." 298 F.2d at 118.

Here, "where the shareholder is but the shadow of the corporation," ibid., it would be unrealistic to attempt to distinguish between plaintiff's purpose and the purpose of his wholly owned and controlled corporation. The record discloses that the purpose of the transaction was to enable Industrial to obtain a tax loss upon the liquidation of Southern. It would be an unwarranted extension of the corporate fiction to differentiate between the resulting economic benefit to Industrial and the ultimate gain to plaintiff. As in *Bradbury* and *Collins*, this Court is of the view that the present record does not disclose those "conspicuously countervailing considerations" which might negative a finding of dividend equivalence. Cf. Hasbrook v. United States, supra; Kerr v. Commissioner of Internal Revenue, supra.

Plaintiff's final argument is that the net result of the Southern transaction was that he received, fourteen months later, Industrial stock, a result which he could have accomplished by other means without receiving taxable income. There is no question that plaintiff could have avoided receiving a taxable distribution had he in 1961 taken Industrial stock in exchange for his Southern stock, or had he simply donated his Southern stock to Industrial as a capital contribution. But he did not do so. Instead, he took a position as a creditor, and he must be taxed on the transaction as he entered into it. As the Court of Appeals stated in United States v. Collins, supra:

" * * * once a taxpayer elects a particular mode of business procedure, he cannot avoid the statutory ramifications of his action by indicating results which might have obtained under alternate procedures. As the Court said in Gray v. Powell, 314 U.S. 402, 414, 62 S.Ct. 326, 86 L.Ed. 301 (1941): 'The choice of disregarding a deliberately chosen arrangement for conducting business affairs does not lie with the creator of the plan.'" 300 F.2d at 825.

And see, e. g., Hasbrook v. United States, supra, 343 F.2d at 814; Wall v. United States, 164 F.2d 462, 466 (4th Cir. 1947); Cabot Corp. v. United States, 220 F. Supp. 261, 265 (D.Mass.1963), aff'd per curiam, 326 F.2d 753 (1st Cir.1964); cf. Palmer v. Commissioner of Internal Revenue, 354 F.2d 974, 975 (1st Cir. 1965).

For the foregoing reasons, this Court agrees with the Commissioner that the creation of the $125,700 indebtedness from Industrial to plaintiff in connection with the transfer of his Southern stock in March 1961 constituted a distribution essentially equivalent to a dividend and was taxable as such.

Judgment will be entered for defendant, with costs.